**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Best Western International, Inc., an Arizona non-profit corporation, | ) ) ) | No. CV 07-00807-PHX-RCB |
| | ) | **ORDER** |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| Manuben Patel, an individual, | ) ) | |
| Defendant. | ) ) | |
| | ) | |

_____

### ***Introduction***

On September 10, 2007, the court granted plaintiff Best Western, International's ("BWI") application for a preliminary injunction by (doc. 38).  In so doing, the court found that BWI had "shown 'probable success on the merits,' or at least serious questions going to the merits' with respect to [its] claim that defendant breached the Membership Agreement; and hence that defendant is in violation of that Agreement for continued use of BWI's marks."  Id. at 3.  To support that finding, the court

1  relied upon the "ample proof in the record that despite being

2  given several opportunities to do so, defendant did not comply

3  with BWI's Design Excellence Program; and that failure to comply

4  was the basis for BWI terminating the Membership Agreement with

5  defendant."  Id.

6     In that prior order this court also found that BWI had "shown

7  more than a 'possibility of irreparable injury' in the form of

8  damage to its goodwill and reputation; loss of control over the

9  reputation of its trademark; and likelihood of confusion."  Id.

10 at 4.  As the court indicated it would, "more fully" set forth

11 below are its reasons for granting BWI's application for a

12 preliminary injunction.[1]  See id. at 3.

13                          ***Background***

14    Plaintiff BWI "operates as a membership organization

15 consisting of individually owned and operated hotels (i.e., its

16 members)."  Co. (doc. 1) at 2, ¶ 7.  BWI "has registered with the

17 [U.S.] Patent and Trademark Office various trademarks, service

18 marks and collective membership marks."  Id. at 3, ¶ 12.

19    BWI entered into a "Membership Agreement" with defendant

20 Manuben Patel on approximately August 9, 1996, with respect to

21 the Torch-Lite Inn (the "motel") located in Santa Cruz,

22

23

24

25

26

27

28

---

[1]     On November 5, 2007, the court conducted a hearing with respect to BWI's application for an "Order to Show Cause Why Manuben Patel Should Not be Held in Contempt" ("OSC") for failing to comply with the September 10, 2007 preliminary injunction.  See Doc. 41-4.  For reasons fully set forth on the record, the court found defendant to be in contempt and ordered full compliance with that injunction by no later than 12:00 noon, November 16, 2007.  The court did not, however, order sanctions *per se*, although it did permit BWI to seek its attorneys' fees and costs incurred in pursuing that OSC.

California.   Preliminary Injunction Application ("Appl'n") (doc.
4), Pollack Affidavit (April 12, 2007) attached thereto at 9,
¶ 3; and exh. A thereto (copy of Membership Application and
Agreement).   Under that Agreement, *inter alia*, defendant was
granted "a non-exclusive license to use, . . . [BWI] trademarks,
service marks, and identification symbols[.]" Id., exh. A thereto
at 4, ¶ 20.   That License Agreement unequivocally states that it
"terminates upon termination of [defendant's] Membership
Agreement." Id., exh. A thereto at 4, ¶ 22.   The Membership
Agreement further provides that "[w]ithin fifteen (15) days of
license  termination, [defendant] *shall* remove from public view
and cease using all [BWI] symbols." Id. (emphasis added).

On approximately December 19, 2006, BWI notified defendant
that her "membership had been terminated for failure to comply
with [BWI] design standards[.]"  Appl'n (doc. 4), Pollack Aff.
attached thereto at 2, ¶ 9.   At that time, as the Membership
Agreement requires, BWI "advised Defendant that the signs and
logo items must be removed within fifteen (15) days." Id.
According to Cheryl Pollack, BWI's "Director of Member Care and
Development Administration," despite "repeated requests . . .
Defendant has refused to cease and desist from use of the name,
signage and membership mark, or similar reproductions of" BWI.
Id. at 1, ¶ 1; and 2 at ¶ 14.

BWI filed the present action on April 17, 2007, alleging nine
causes of action including breach of contract, trademark
infringement under the Lanham Act, 15 U.S.C. §§ 1114(a) and 1125,
federal trademark dilution, and two Arizona state law based
causes of action.   With the filing of that complaint, BWI filed

1  this application for a preliminary injunction, seeking an order

2  "restraining Defendant[] from using the [BWI] name, marks, logo

3  and emblem (the Best Western Marks)." Appl'n (doc. 4) at 8.

4      Before the filing of any opposition, the present action was

5  reassigned to this court. See Doc. 25. Shortly thereafter, on

6  July 13, 2007, and again on July 31, 2007, BWI filed supplemental

7  declarations in support of its preliminary injunction

8  application. The thrust of those declarations is that defendant

9  is continuing to "unlawfully use" BWI's marks, and that BWI is

10 continuing to be "irreparably harmed" thereby. See Doc. 28 at 2;

11 and doc. 30 at 1 and 2. Pursuant to the court's order, on August

12 24, 2007, defendant filed her response to this application (doc.

13 34); and BWI filed its reply (doc. 36) on August 31, 2007. As

14 mentioned at the outset, following oral argument on September 10,

15 2007, the court granted BWI's application for a preliminary

16 injunction. See Doc. 38. Detailed below is the "ample proof"

17 referred to it the court's prior order which readily supports

18 granting BWI's application for a preliminary injunction. Doc. 38

19 at 3.

20                    ***Discussion***

21 ***I.  Preliminary Injunction Standard***

22     According to the Ninth Circuit, "the basic function of a

23 preliminary injunction is to preserve the status quo pending a

24 determination of the action on the merits." Dep't of Parks &

25 Rec. v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1124 (9th Cir.

26 2006) (internal quotation marks and citation omitted). "[T]he

27 status quo is not simply any situation before the filing of the

28 lawsuit, but rather the last uncontested status that preceded the

1   parties' controversy." Id. (citing GoTo.Com, Inc. v. Walt Disney

2   Co., 202 F.3d 1199, 1210 (9ᵗʰ Cir. 2000)). Thus, in GoTo.Com, a

3   trademark infringement case, the Ninth Circuit held that the

4   *status quo* which was to be preserved by the issuance of a

5   preliminary injunction "existed before [the defendant] began

6   using its allegedly infringing logo." GoTo.Com, 202 F.3d at

7   1210.  Likewise, in the present case, the status quo which BWI is

8   seeking to preserve is the state of affairs before defendant

9   began her  alleged improper use of BWI's marks.

10      The Ninth Circuit "has recognized two different sets of

11   criteria for preliminary injunctive relief." Southeast Alaska v.

12   U.S. Army Corps, 472 F.3d 1097, 1100 (9ᵗʰ Cir. 2006).  Initially,

13   BWI invoked the "traditional test" for obtaining such relief.[2]

14   See  id.  That "general test . . . requir[es] a plaintiff to

15   establish (1) a strong likelihood of success on the merits,

16   (2) the possibility of irreparable injury to plaintiff if

17   preliminary relief is not granted, (3) a balance of hardships

18   favoring the plaintiff, and (4) advancement of the public

19   interest (in certain cases)." Lands Council v. Martin, 479 F.3d

20   636, 639 (9ᵗʰ Cir. 2007) (internal quotation marks and citation

21   omitted).  In its reply,[3] however, BWI shifted gears slightly and

22   invoked the "alternative test" in this Circuit for preliminary

23   relief.  See Southeast Alaska, 472 F.3d at 1100 (citations

24   omitted).  That test requires  the moving party to "demonstrate[]

25   either '(1) a combination of probable success on the merits *and*

26

27      [2]   Appl'n (doc. 4) at 4.

28      [3]   Reply (doc. 36) at 7, n. 8.

- 5 -

the possibility of irreparable injury *or* (2) the existence of serious questions going to the merits *and* that the balance of hardships tips sharply in [its] favor.'"   <u>Grocery Outlet Inc. v. Albertson's Inc.</u>, 497 F.3d 949, 951 (9th Cir. 2007) (quoting <u>Sardi's Restaurant Corp. v. Sardie</u>, 755 F.2d 719, 723 (9th Cir. 1985)) (emphases in original).

As the Ninth Circuit has repeatedly stated, "[t]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."   <u>Id.</u> (quoting <u>A & M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1013 (9th Cir. 2001) (quotation marks and citation omitted)); <u>see also</u> <u>Rebecca Irene Fisheries, LLC v. Gutierrez</u>, 2005 WL 3434443, at *1 (W.D. Wash. 2005) (citing <u>United States v. Odessa Union Warehouse Co-Op</u>, 833 F.2d 172, 174 (9th Cir. 1987)) ("The analysis is often compressed into a single continuum where the required showing of merit varies inversely with the showing of irreparable harm.")   "They are not separate tests but rather the outer reaches of a single continuum."   <u>Id.</u> (internal quotation marks and citation omitted). As mentioned at the outset, in granting BWI's application, the court applied the first preliminary injunction standard identified in <u>Sardi's Restaurant</u>, 755 F.2d at 723.   Applying that standard obviates the need to consider whether the balance of hardships tips decidedly in BWI's favor.

. . .

### A.   *"Probable Success on the Merits"*

"Under the sliding scale theory," of preliminary injunctions in this Circuit, "a party seeking an injunction need not demonstrate that he will succeed on the merits,  but must at least show that his cause presents serious questions of law worthy of litigation.'"  <u>Iconix, Inc. v. Tokuda</u>, 457 F.Supp.2d 969, 975 (N.D. Ca. 2006) (quoting <u>Toanqa Press, Inc. v. City of Los Angeles</u>, 989 F.2d 1524, 1528 (9th Cir. 1993)).  "'Serious questions' are those which are 'substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation.'"  <u>Id.</u> (quoting, *inter alia*, <u>Senate of State of Cal. v. Mosbacher</u>, 968 F.2d 974, 977-78 (9th Cir. 1992)). "Although the serious questions posed by the movant 'need not promise a certainty of success, nor even a probability of success,'" the Ninth Circuit has indicated that the movant "must nevertheless demonstrate a 'fair chance of success' on the merits." <u>Id.</u> (quoting <u>Gilder v. PGA Tour, Inc.</u>, 936 F.2d 417, 422 (9th Cir. 1991)).  As more fully discussed below, at the very least BWI has shown a "fair chance of success on the merits."  Thus it has satisfied the first element necessary to obtain a preliminary injunction.

### 1.  *Breach of Contract*

Starting from the premise that the Membership Agreement is a franchise agreement governed by California law,[4] defendant

---

[4]  BWI "vigorously disputes" this premise, arguing that it is not a franchise; it is not subject to sections 20020 and 20021 of the California Business and Professional Code; and California law does not apply "or in any way governs BWI's termination of Patel's Membership."  Reply (doc. 36)at 4, n. 4 (citation omitted).

1  contends that BWI cannot show the requisite probability of

2  success on the merits because it did not have "good cause" to

3  terminate that Agreement as section 20020 of the California

4  Business and Professions Code mandates.[5]  In arguing lack of good

5  cause, defendant claims that when she initially entered into the

6  Membership Agreement in August, 1996, BWI "did not disclose" that

7  it had "had recently initiated a new series of design cycles[.]"

8  Doc. 34 (Resp.), exh. A thereto (Decl'n of Manuben Patel

9  (8/22/07)) at 1,  ¶¶ 2 and 3.  Ms. Patel further declares that

10 had she "known of the design cycles when [she] purchased" the

11 subject property, [she] would have negotiated a lower price."

12 Id. at 2, ¶ 5.  Nonetheless, defendant claims to have expended

13 almost $750,000.00 "trying to comply" with BWI's "new

14 guidelines."  Id. at 2, ¶ 6.

15      "Despite [those] efforts," defendant contends that BWI

16 "refused to approve the remodel."  Id. at 2, ¶ 7.  Further BWI

17 also supposedly "refused to cooperate with the work and often did

18 not communicate  with [defendant]."  Id. To illustrate, defendant

19 points out that she paid for a counter redesign three times.  Id.

20 at 2, ¶ 8.  Each time, however, defendant claims that the design

21 was "disapproved" by BWI's inspector, even though she "hired an

22

23 _____

24      [5]      That statute reads as follows:

25           Except as otherwise provided by this chapter, no franchisor
          may terminate a franchise prior to the expiration of its term,
          except for good cause.  Good cause shall include, but not be
26           limited to, the failure of the franchisee to comply with any
          lawful requirement of the franchise agreement after being given
27           notice thereof and a reasonable opportunity, which in no event
          need be more than 30 days, to cure the failure.

28      Cal. Bus. & Prof. Bode § 20020 (West 1997).

1  architect who had designed other [BWI] counters[,]" and BWI
2  approved those plans.   Id.

3      According to defendant "[t]hroughout 2006, [she] tried to
4  resolve the . . . design concerns with [BWI], but to no avail."
5  Id. at 3, ¶ 10.  Defendant asserts that she and Ms. Pollack then
6  "agreed to meet informally" in the fall of 2006 "to discuss the
7  design issues."  Id.  Rather than the "informal" meeting which
8  defendant anticipated, as defendant describes it, that meeting
9  was a "formal committee hearing before 12 people."  Id. at 3,
10 ¶ 11.  Defendant claims that "[b]ecause [she] did not have notice
11 of the hearing, [she] did not have plans or reports showing [her]
12 compliance with [BWI's] requirements."  Id. Nor, in the claimed
13 absence of notice, did she have "a chance to prepare with [her]
14 attorney or be represented in any manner at the hearing."  Id.
15 Nonetheless, as defendant recalls it, "[a]t the end of the
16 hearing, [BWI] told [her] that because the [property] had always
17 passed its inspections with high marks, [BWI] was going to take
18 the design problems under advisement."  Id. at 3, ¶ 12.
19 Therefore, defendant's impression when she left that meeting was
20 that she and BWI "were going to resolve [their] dispute[.]"  Id.
21 At that point defendant "did not believe [her] [BWI] franchise
22 was in jeopardy."  Id.

23     When she returned from Phoenix though, defendant learned that
24 her property was no longer listed on BWI's website.  Id. at 3,
25 ¶ 13.  Consequently, one of her regular customers had trouble
26 making an online reservation.  Id.  Defendant then contacted BWI
27 and "learned that after the Phoenix hearing, [BWI] had terminated
28 [her] [Membership] [A]greement and . . . removed [the property]

- 9 -

1  from its reservations system." Id. at 4, ¶ 14.  Thereafter,

2  defendant "received a letter from [BWI] dated December 19, 2006,

3  which formally terminated [her] franchise." Id.  According to

4  defendant, that "letter provided no factual basis or any other

5  reason for the termination." Id.

6      In light of the foregoing, plaintiff requested

7  reconsideration of BWI's termination decision. Id. at 4, ¶ 15;

8  see also Reply (doc. 36), exh. A (doc. 36-2) (Decl'n of Neal

9  Crandall 8/30/07) thereto; and exh. 20 (doc. 36-22) thereto.

10  When BWI declined to reconsider, on April 30, 2007 (roughly two

11  weeks after the filing of this action), defendant commenced a

12  federal court action in the Northern District of California

13  against BWI, alleging "breach . . . [of] the franchise agreement

14  and violat[ions] [of] California franchise law." Resp. (doc.

15  34), exh. A thereto (doc. 34-2) at 4, ¶ 16.  In that lawsuit

16  defendant further alleges that BWI acted in "bad faith" in

17  terminating the Membership Agreement because she had "confirmed

18  with its design requirements." Id.

19      As a result of having her Membership Agreement cancelled,

20  defendant claims that her business has been "devastated"

21  primarily because she is no longer a part of BWI's online

22  reservation system. Id., exh. A (doc 34-2) thereto at 4, ¶ 18.

23  Thus, defendant asserts losses of "over $350,000 in the first

24  half of 2007." Id. at 5, ¶ 18.  In addition to those losses,

25  defendant declares that BWI's "demands that [she] cease using its

26  logo have been similarly injurious." Id. at 5, ¶ 19.  More

27  specifically, defendant declares that "it will cost [her] at

28  least $18,000 to replace all the other items – i.e. shampoos,

- 10 -

towels, sheets, soap – with Best Western logos[]" – costs for
which BWI has "refused to reimburse" her.   Id.

Based upon the foregoing events defendant maintains that
BWI's allegation that she did not "comply with Best Western
design standards"[6] is "unsupported." Resp. (doc. 34) at 10.
Moreover, defendant contends that BWI has not "set forth which
design standards or regulations [she] violated. . . because there
were none." Id. Hence, as previously mentioned, defendant is
taking the position that BWI did not have good cause to terminate
its Membership Agreement with her.   In the absence of good cause
for termination, defendant asserts that BWI cannot show that it
will "prevail on the merits." Id. at 11.   BWI, therefore, is not
entitled to a preliminary injunction.

Careful examination of the record belies defendant's
position, however.   As will soon become evident, not only is
there substantial proof of defendant's repeated non-compliance
with BWI's Design Program, but BWI thoroughly documented that
non-compliance.   Moreover, to the extent defendant *may* have a
claim against BWI for its termination of the Membership
Agreement, that is not sufficient to defeat this application for
a preliminary injunction.   See AT&T Corp. v. Vision One Security
Systems, 1995 WL 476251, at *6 (S.D.Cal. 1995)(recognizing that
while defendant "may have claims against AT&T for its conduct in
relation to the termination of the license, . . . any such claims
are not sufficient to defeat the merits of the preliminary
injunction[]") (citing, *inter alia*, Burger King Corp. v. Hall,

_____

[6]     Co. (doc. 1) at 7, ¶ 25.

1  770 F.Supp. 633, 636 (S.D. Fla. 1991) (allegation of wrongful
2  termination of franchise agreement gives rise to a claim for
3  damages, not the right to continue using the mark)).

4      BWI paints a very different picture of the circumstances
5  giving rise to cancellation of defendant's Membership Agreement
6  – circumstances which BWI contends show a probability of success
7  on the merits as to its breach of contract and trademark
8  infringement claims.  Those circumstances are outlined in the
9  declaration of Neal Crandall, BWI's Manager of Brand Development,
10 who has worked in BWI's design department for "approximately
11 . . . 13 years[,]" and "was involved in . . . drafting . . . the
12 Design Excellence Program ["the Program" or "the Design
13 Program][.]"   Reply, exh. A thereto (doc. 36-2) at 1, ¶ 1; and
14 at 2, ¶ 5.  One aspect of Mr. Crandall's job is to "evaluate
15 whether existing BWI Members [are] comply[ing] with [that] Design
16 . . . Program."  <u>Id.</u> at 2, ¶ 3.   In that capacity Mr. Crandall
17 has become "familiar with" defendant's situation and has
18 corresponded with her about "her Motel and compliance with [the]
19 Design . . . Program."  <u>Id.</u>

20     Despite defendant's assertions to the contrary, what emerges
21 through Mr. Crandall's declaration and accompanying exhibits is a
22 fairly extensive history of defendant not complying with BWI's
23 Design Program.  In fact, even prior to the Design Program which
24 is the focus of this action, in November 1997, defendant's motel
25 was placed on "probationary status due to noncompliance with"
26 BWI's design Renovation Guidelines in effect at that time.  <u>See</u>
27 <u>id.</u>, exh. 5 thereto (doc. 36-7).  Apparently defendant did bring
28 her property into compliance after that.  In 2003, however, BWI's

1   Board of Directors adopted another set of design criteria, *i.e.*

2   the "Design Excellence Program." <u>Id.</u>, exh. A (doc. 36-2) at 2,

3   ¶ 5.  That Program consisted of three design phases for various

4   aspects of member properties, such as lobbies, guest rooms and

5   grounds.  <u>Id.</u> at 2-3, ¶ 7.  Included in that Program were

6   "deadlines for compliance with th[o]se three phases[.]"  <u>Id.</u>  The

7   "purpose" of this particular Design Program, according to Mr.

8   Crandall, "was to ensure greater conformity between all Member

9   properties, to ensure that all BWI properties meet the same

10   standards for quality, and to implement a plan for each Member to

11   update and renovate the Member's property."  <u>Id.</u> at 2, ¶ 6.

12      As "part of [its] overall policy to notify members of changes

13   in BWI rules, regulations, standards, and guidelines[,]" BWI

14   conducted a mass mailing and introduced the Program at its annual

15   convention.  <u>Id.</u> at 3, ¶¶ 8 and 10.  BWI then "began to inspect

16   Member properties to ensure that the Members were aware of the .

17   . . Program and its deadlines, and began offering its assistance

18   to Members, when requested, in complying with the . . . Program."

19   <u>Id.</u> at 4, ¶ 12.  As part of this process, BWI first inspected

20   defendant's motel "in March 2004 - . . . 9 months before the

21   deadline for complying with Design Phase I and . . . 21 months

22   before the deadline for complying with Design Phase II."  <u>Id.</u> at

23   4, ¶ 13 (citing exh. 3 thereto).  That March 2004 inspection

24   revealed a number of ways in which defendant's motel was not in

25   compliance with the Program.  <u>See id.</u>, exh. 3 thereto.  Those

26   deficiencies were outlined in a "Design Excellence Checklist" -

27   the first of several reports in which BWI documented defendant's

28   non-compliance with the Design Program.  That Checklist notified

1  defendant that she had nine months, or until January 1, 2005, in

2  which to bring her motel into compliance with Phase I of the

3  Program.  See id.   The BWI Board did give defendant a short

4  extension, however, until January 23, 2005, by which "to renovate

5  and update her property[]" to bring it into compliance with Phase

6  I.  Id. at 5, ¶ 19 (citing exh. 4 thereto).

7       Defendant did not meet that extended deadline.  Therefore, by

8  letter dated April 20, 2005, BWI advised defendant that her

9  property was "placed in a probationary status."  Id., exh. 4

10 thereto (doc. 36-6) at 1.  As in November 1997, defendant was

11 further advised that if the listed conditions were not corrected

12 by the next design review process, her "property may be placed in

13 hearing status[.]" Id. at 2.  Also as in November 1997, that

14 April 2005 letter went on to explain that if defendant's

15 "property is placed on design probation twice within the 24-month

16 period following the first probation notification, that may also

17 result in [her] membership being placed in hearing status."  Id.

18 "If that occurs," defendant was informed that her BWI "membership

19 may be canceled" pursuant to BWI's Bylaws and Rules and

20 Regulations.  Id.  In the meantime, BWI informed defendant that

21 it would be revisiting her property on approximately July 20,

22 2005, to report on her "progress  . . . attempt[ing] to meet

23 [BWI's] design standards."  Id., exh. 4 (doc. 36-6) thereto at 1.

24    At that second inspection, on August 2, 2005, defendant still

25 was not in compliance with Phase I, which originally had a "due

26 date" of January 1, 2005, but which had been extended until

27 January 23, 2005.  See id. at 6, ¶ 22; and exh. 6 thereto (doc.

28 36-8) at 1.  Thus, from BWI's standpoint, defendant "made

virtually no legitimate effort, of which [it] was aware, to comply with Design Phase I." Id. at 6, ¶ 23.

Despite the passage of another five months, a January 11, 2006, inspection revealed that defendant still was not in compliance with Design Phase I, which should have been completed a year earlier. See id., exh. 7 (doc. 36-9) thereto at 1. Thus defendant's "Membership remained on probation[.]" Id. at 6, ¶ 25. After that January 2006 inspection, defendant sought a 90 day extension to bring her motel into compliance with Design Phase I. Id. at 7, ¶ 27. On February 23, 2006, the Design Review Committee, of which Mr. Crandall is a member, denied that request. Id. The Committee's rationale was that it "only ha[d] authority to grant an extension not to exceed a year and . . . [defendant] had already had over a year to bring . . . her Motel into compliance and had failed to do so[.]" Id. Upon that denial defendant could have sought an additional extension, but she did not. See id.

Yet another BWI inspection in July 2006 revealed that defendant's motel still was not in compliance with Design Phase I, and further that it was not in compliance with Design Phase II. See id. at 7, ¶ 30; and exh. 9 (doc. 36-11) thereto. Therefore, by letter dated September 15, 2006 ("the termination letter"), defendant was informed that "grounds exist for . . . [BWI] to cancel [her] membership[,]" and thus the Board would be "consider[ing] cancellation of [her] . . . membership at an upcoming Board meeting." Id. at 8, ¶ 31; and exh. 10 (doc. 36-12) thereto at 1. Defendant was also specifically informed that "[b]ecause [she] [did] not meet the conditions stated in the

1    April 20, 2005 probation letter, [her] [BWI] membership [was]

2    be[ing] placed in hearing status." <u>Id.</u>, exh. 10 (doc. 36-12)

3    thereto at 10.  That letter continued: "if your membership is

4    cancelled, **you will immediately be prohibited from using any**

5    **[BWI] signs, marks or logos, and from conducting business in**

6    **anyway as a [BWI] hotel.**" <u>Id.</u> (emphasis in original).  Defendant

7    was instructed that it was "critical that [she] submit **all**

8    relevant information pertaining to this situation because the

9    Board's final decision will include consideration of what you

10   submit." <u>Id.</u> (emphasis in original).[7]

11       In addition to summarizing "the incomplete design items[,]"

12   that termination letter included an enclosure entitled "**HEARING -**

13   **DESIGN ISSUES**[,]" explaining the hearing process.  <u>See id.</u> at 3.

14   In that letter BWI informed defendant that "[d]ue to the property

15   not being maintained to [its] standards and as stated in . . .

16   the [BWI] Bylaws and [in] . . . the [BWI] Rules and Regulations,

17   the Board of Directors ha[d] grounds for cancellation of [her]

18   membership." <u>Id.</u> BWI further informed defendant that "[t]he

19   non-compliance with [its] Rules and Regulations and New

20   Construction and Refurbishment Guidelines occurred as a result of

21   [her] not completing renovation requirements in a timely

22   fashion." <u>Id.</u>

23       As the termination letter allowed, defendant requested a

24   hearing before the Board.  <u>See id.</u>, exh. 12 (doc. 36-14) thereto.

25

26              [7]      Defendant maintains, as noted earlier, that she had no notice of
               this meeting.  Even if there is a factual dispute as to whether defendant
27             actually received this notification, that does not preclude a finding that
               BWI has shown a probability of success on the merits with respect to its
28             breach of contract and trademark infringement causes of action.

1   Prior to that hearing, BWI provided defendant with copies of all
2   of the documents which it intended to present to the Board at the
3   hearing.  <u>See</u> <u>id.</u>, exh. 13 (doc. 36-15) thereto.  Additionally,
4   prior to that hearing, as it "routinely" does, a "'pre-Board'
5   inspection" of defendant's property was conducted at the Board's
6   request.  <u>Id.</u>, exh. A (doc. 36-2) thereto at 10, ¶ 42.  The
7   purpose of that inspection was "to inform the Board as to whether
8   the Member's property is likely to comply with the provisions of
9   the . . . Design Guidelines, which was distributed to members in
10  2006 and became effective on January 1, 2007, and whether
11  [defendant] would meet the 2007 Design Phase III deadline if the
12  Membership was not terminated."  <u>Id.</u>  Once again, defendant's
13  motel did not pass  inspection.  Rather, that inspection
14  "revealed that [she] had still  not complied with Design Phases I
15  and II[]" even though "she had had 24 months - since January 2005
16  - to comply with Design Phase I and 12 months - since January 20
17  - to comply with Design Phase II."  <u>Id.</u> at 11, ¶ 43; and at 12-
18  13, ¶ 50.
19      Mr. Crandall attended defendant's termination hearing, but
20  defendant did not.  <u>See</u> <u>id.</u> at 11, ¶¶ 44 and 46.  Instead,
21  defendant's daughter, Sabrina Patel,[8] "appeared before the Board
22  in an effort to show why [defendant's] Membership should not be
23  terminated and to explain why [defendant] had repeatedly failed
24  to comply with Design Phases I and II, three years after being
25  advised of the compliance deadlines."  <u>Id.</u> at 11, ¶ 45.  Ms.
26  Patel did not "present any good cause or reason for [defendant's]

27  _____
28      [8]    At the contempt hearing, Sabrina Patel characterized herself as the
            longtime general manager of the BWI motel at issue.

1  repeated failure to comply with the Design Program and its
2  compliance deadlines, and [she] provided no reasonable assurance
3  that [defendant] would promptly comply with the Design Phases I
4  and II compliance deadlines, which were past, or that [defendant]
5  had taken steps to ensure that she would be able to comply with
6  the Design Phase III compliance deadline in 2007." Nor did Ms.
7  Patel "provide any explanation as to why [defendant's] Membership
8  should not be terminated." Id. at 11-12, ¶ 47.

9      Following that hearing, "the BWI Board voted to terminate
10  [defendant's] Membership[]" and advised her of its decision in
11  writing. Id. at 13, ¶ 51; and exh. 18 (doc. 36-20) thereto.
12  Defendant sought reconsideration, but the Design Review Committee
13  denied that request because she "did not meet the criteria[.]"
14  Id. at 13, ¶ 55; (citing exh. 21 (doc. 36-23) thereto). That
15  "denial was based, in part, on the fact that [defendant] had
16  received numerous extensions to comply with Design Phases I and
17  II and despite these extensions had yet to comply[.]" Id. at 13,
18  ¶ 56.   Procedurally defendant's request for reconsideration also
19  was improper because she did not comply with BWI's Rules and
20  Regulations pertaining to such requests. See id.

21      On January 11, 2007, defendant again requested
22  reconsideration of the Board's cancellation decision. See id. at
23  14, ¶ 59; and exh. 24 (doc. 36-26) thereto. BWI denied this
24  request. Id. at 14, ¶ 60; and exh. 23 (doc. 36-25) thereto.

25      The parties disagree as to which law applies here –
26  California or Arizona. The court will leave final resolution of
27  that issue for another day. There is no need to resolve that
28  choice of law issue at this juncture because the elements

1    necessary to prove a breach of contract claim are substantially

2    similar regardless of whether the court applies California or

3    Arizona law.

4        To prevail on a breach of contract claim under Arizona law,

5    "a plaintiff must show a contract, a breach of contract, and

6    damages."   Konrath v. Amphitheater Unified School Dist. No. 10,

7    2007 WL 2809026, at *26 (D.Ariz. Sept. 26, 2007) (citing Graham

8    v. Asbury, 540 P.2d 656, 657 (1975)).   Similarly, under

9    California law, "'[a] cause of action for breach of contract is

10   comprised of the following elements: (1) the contract, (2)

11   plaintiff's performance or excuse for nonperformance, (3)

12   defendant's breach, and (4) the resulting damages for

13   plaintiff.'"   Cal-Agrex, Inc. v. Tassell, 2007 WL 2782969, at *1

14   (N.D.Cal. Sept. 25, 2007) (quoting Careau & Co. v. Sec. Pac. Bus.

15   Credit, Inc., 222 Cal.App.3d 1371, 272 Cal.Rptr. 387, 395

16   (Ct.App. 1990)).

17       Here, there is no dispute that a contract existed between BWI

18   and defendant in the form of the Membership Agreement.   At this

19   juncture damages to BWI also are not at issue as defendant is not

20   challenging BWI's claims that she owes it "at least $17,853.35,

21   representing certain fees, dues, charges and costs imposed on the

22   membership, excluding interest[,]" as well as liquidated damages.

23   See Co. (doc. 1) at 8, ¶ 30; and at 10, ¶ 45.   Rather, in the

24   context of this preliminary injunction application, the issue at

25   this point centers on whether, as BWI contends, it can show a

26   "fair chance of success on the merits" as to its breach of

27   contract  claim.   See Iconix, 457 F.Supp.2d at 975 (internal

28

quotation marks and citation omitted).  BWI has met this standard.

   BWI's "Rules and Regulations" require that "all members . . . participate in all mandatory programs and promotions which may be adopted by the Board[,]" such as the Design Program.  See Crandall Aff. (doc. 36-2), exh. 8 (doc. 36-10) thereto at 11, Chap. V, § 500.42.  Further, those Rules and Regulations expressly provide that BWI "may cancel the membership" if a member "fails to conform to the obligations or meet the standards" such as those contained in the Design Program.  See id., exh. 8 thereto at 18, Chap. XI, § 1100.5.  Similarly, BWI's "Bylaws and Articles" gives BWI the "right to cancel any membership" under one of several conditions, including "[f]ailure to conform to the obligation to meet the standards as set forth in the Membership Application and Agreement, Articles of Incorporation, Bylaws, current Rules and Regulations or Board policies."  Id., exh. 24 (doc. 36-27) thereto at 4, Art. II, § 8(A)(2).  More succinctly, the Membership Agreement unequivocally states that it terminates "upon default of any obligation to [BWI], as more fully set forth in the Bylaws, Rules and Regulations, and Operations Manual."  Appl'n (doc. 4), Pollack Aff. attached thereto, exh. A thereto at 4, Part II, ¶ 18(b) (emphasis added).

   The record as presently constituted shows, as discussed above, that defendant did not conform to the Design Program obligations or meet the standards of that Program.  Moreover, that non-compliance was repeated and is well documented in the record.  Defendant's non-compliance provided BWI with more than

1  sufficient grounds to cancel her Membership Agreement.  Thus, BWI

2  has met the first prong necessary to obtain injunctive relief -

3  probable success on the merits of its breach of contract claim.

4          **_2.  Trademark Infringement_**

5       Likewise, BWI has shown a probability of success with respect

6  to its claim for trademark infringement.  "Success on the merits

7  for a trademark infringement claim requires a plaintiff to prove:

8  (1) ownership of a valid trademark, and (2) likelihood of

9  confusion."  Paul Frank Industries, Inc. v. Sunich, 502 F.Supp.2d

10  1094, 1099 (C.D.Cal. Aug. 21, 2007) (citing Brookfield

11  Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036,

12  1046 (9th Cir. 1999)).  In the present case, there is no dispute

13  that BWI owns the marks which defendant continues to use.  Appl'n

14  (doc. 4), Pollack Aff. attached thereto at 2, ¶ 12.  Furthermore,

15  for reasons which will soon become obvious, defendant did not

16  even attempt to argue that there is no likelihood of confusion

17  here.

18   "The likelihood of confusion determination asks 'whether the

19  similarity of the marks is likely to confuse customers about the

20  source of the products.'"  Topline Corp. v. 4273371 Canada, Inc.,

21  2007 WL 2332471, at *5 (W.D. Wash. Aug. 13, 2007) (quoting

22  GoTo.com, 202 F.3d at 1205)).  The Ninth Circuit has "developed

23  eight factors, the so-called Sleekcraft factors, to guide the

24  determination of likelihood of confusion."  GoTo.com, 202 F.3d at

25  1205.  Those factors are: "(1) strength of the mark,

26  (2) proximity of the goods, (3) similarity of the marks,

27  (4) evidence of actual confusion, (5) marketing channels used,

28  (6) degree of care likely to be exercised by the purchaser,

(7) evidence of bad faith intent in selecting the mark, and

(8) likelihood of expansion or overlap of the products." Silverlit Toys Manufactory, Ltd. v. Absolute Toy Marketing, Inc., 2007 WL 521239, at *7 (N.D.Cal. Feb. 15, 2007) (citing AMF, Inc. v. Sleekcraft, 599 F.2d 341, 348-49 (9th Cir. 1979)). "[E]ach of these factors is not necessarily relevant in every case," however. Id. "[T]he list of factors functions as a guide and is neither exhaustive nor conclusive." Id. (citing Metro Pub., Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993)). "In fact, the Ninth Circuit has warned against 'excessive rigidity' in applying the factors and noted that 'it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of factors.'" Id. (quoting Brookfield Communications, 174 F.3d at 1054) (other citations omitted). Such is the case here in that an examination of Sleekcraft factors three, four and six plainly shows that the requisite likelihood of confusion exists on this record.

Focusing for the moment on the third factor -- similarity of the marks -- it is undisputed that defendant is using BWI's marks. Therefore, the alleged infringing mark is not just similar, it is identical. Consequently, "the likelihood of confusion is very high[.]" See AT&T, 1995 WL 476251, at *6 (citing S & R Corp. v. Jiffy Lube International, Inc., 968 F.2d 371, 375 (2nd Cir. 1992) (citing other cases so holding)) ("[C]ourts have underscored that the likelihood of confusion is very high where the alleged infringer is using the exact trademark to which the plaintiff holds the rights.); cf. Gucci America, Inc. v. Pieta, 2006 WL 4725706, at *5 (C.D.Cal. 2006)

1  (citation omitted) ("The use of an identical mark on identical

2  products is the paradigm of likelihood of confusion.")

3       Further, it is undisputed that plaintiff owns the BWI marks

4  and that defendant is using that mark in connection with her

5  hotel, without BWI's consent, after cancellation of the

6  Membership Agreement.  Given the court's finding that BWI has

7  shown a probability of success on its claim that defendant

8  breached the Membership Agreement, "[i]t is . . . clear that

9  using the [BWI] Marks is likely to cause confusion among

10 consumers, who will wrongly believe" that defendant is operating

11 a hotel properly affiliated with BWI.  See Dunkin' Donuts

12 Franchised Restaurants LLD v. Cardillo Capital, Inc., 2007 WL

13 2209245, at *5 (M.D.Fla. June 30, 2007).  Adding to this

14 confusion is the fact that defendant had operated as a BWI

15 affiliated hotel for roughly a decade.  This, combined with

16 defendant's continued unauthorized use of the BWI marks, "greatly

17 increases the possibility" that consumers will presume that

18 defendant's hotel retains its BWI affiliation.  Cf. Howard

19 Johnson International, Inc. V. Craven Properties Ltd, Inc., 2002

20 WL 31014858, at *3 (M.D.Fla. 2002) ("fact that the facility had

21 previously operated a s Howard Johnson franchise would greatly

22 increase the possibility that consumers would interpret 'H.J.

23 Inns' as designating a Howard Johnson establishment[]").

24      Additionally, even though "actual confusion is not necessary

25 to a finding of likelihood of confusion under the Lanham Act[,]"

26 Academy of Motion Picture Arts v. Creative House, 944 F.2d 1446,

27 1456 (9th Cir. 1991) (citation omitted), there is proof in this

28 record of actual confusion.  Thus, this fourth Sleekcraft factor

1   also supports a finding of likelihood of confusion in the present
2   case.  More specifically, Christopher L. Myren, the General
3   Manager of another BWI property located in Santa Cruz,
4   California, declares that some of his "Hotel guests have reported
5   to [him] that they have been confused as to which property ([his]
6   or the [defendant's]) was a BWI property and at which property
7   [they] had reservations."  Not. of Filing of Suppl. Declarations
8   (doc. 28), exh. A thereto (doc. 28-2) (Declaration of Christopher
9   L. Myren (July 13, 2007)) at 2, ¶ 7.  Mr. Myren further declares
10  that "[t]hese guests have gone to the [defendant's motel] instead
11  of coming to [his] Hotel because they . . . thought the
12  [defendant's motel] was a BWI property."  Id. at 2, ¶ 8.  As a
13  result of this confusion, Mr. Myren claims to "have lost numerous
14  customers and reservations[.]" Id. at 2, ¶ 8.
15    The sixth Sleekcraft factor – the degree of care likely to be
16  exercised by the purchaser – provides further support for a
17  finding of likelihood of confusion here.  A consumer, seeing
18  BWI's marks on defendant's motel, would have no reason to verify
19  whether that property is, in fact, a BWI affiliated property.
20  That is why, despite the fact that defendant's BWI membership was
21  terminated December 19, 2006, "BWI has received complaints about
22  [defendant's] Motel."  Decl'n of Cheryl Pollack (July 31, 2007)
23  (doc. 30-2) at 2, ¶ 3.  Consumers mistakenly believe that
24  defendant's motel is a BWI sanctioned property and thus it must
25  meet BWI's quality standards.  They are also under the mistaken
26  impression that BWI has control over defendant's motel so that
27  BWI will be able to respond to their complaints.  Thus, as the
28  foregoing demonstrates, when, as here, "a likelihood of confusion

1  exists, a court may reasonably conclude that continuing

2  infringement would result in loss of control over the plaintiff's

3  reputation and loss of goodwill." See AT&T, 1995 WL 476251, at

4  *6 (citing Apple Computer, Inc. v. Formula International Inc.,

5  725 F.2d 521, 526 (9th Cir. 1984)).

6      For all of these reasons, the court easily finds that BWI has

7  demonstrated a likelihood of confusion and thus, in turn, it has

8  shown a probability of success on its trademark infringement

9  cause of action.

10 . . .

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **B.   *"Possibility of Irreparable Injury"***

2    In a trademark infringement case, "a reasonable showing of

3    likelihood of success on the merits raises a presumption of

4    irreparable harm."  <u>Silver Toys Manufactory, Ltd. v. Absolute Toy</u>

5    <u>Marketing, Inc.</u>, 2007 WL 521239, at *6 (N.D.Cal. Feb. 15, 2007)

6    (citing, *inter alia*, <u>LGS Architects, Inc. v. Concordia Homes</u>, 434

7    F.3d 1150, 1155-56 (9th Cir. 2006)).  This presumption arises

8    because, as alluded to earlier, "[i]nfringing activity may lead

9    to a loss of control over [a plaintiff's] reputation and/or

10   dilution of the good will that [plaintiff] has built up over the

11   years."  <u>Paul Frank Industries</u>, 502 F.Supp.2d at 1102.  Thus,

12   "[f]or trademark infringement, the inquiry . . . conflates the

13   two prongs [of the preliminary injunction standard] 'into the

14   single question of whether the plaintiff has shown a likelihood

15   of success on the merits.'"  <u>PDL, Inc. v. All Star Driving School</u>,

16   2007 WL 1515139, at *2 (E.D.Cal. May 22, 2007) (quoting <u>GoTo.com</u>,

17   202 F.3d at 1205 n.4); <u>see also</u>   <u>Honor Plastic</u>, 462 F.Supp.2d at

18   1127 (quoting <u>GoTo.com</u>, 202 F.3d at 1205) ("'[A] plaintiff is

19   . . . entitled to a preliminary injunction in a trademark case

20   simply when it shows a likelihood of confusion.'") Because, as

21   just discussed, BWI has established a probability of success on

22   its trademark infringement claims, a presumption of irreparable

23   harm has arisen.  Therefore, BWI has satisfied both prongs

24   necessary to obtain a preliminary injunction as to its trademark

25   infringement claim.  Likewise, given the close connection between

26   that claim and BWI's breach of contract, that irreparable injury

27   finding, along with the court's earlier finding of a probability

28   of success on the contract claim,  provides another basis for

1  granting BWI injunctive relief.  Accordingly, as the court has

2  previously ruled, BWI is entitled to a preliminary injunction.

3  See El Pollo Loco, Inc. v. Hashim, 316 F.3d 1032, 1038 (9th Cir.

4  2003) (no abuse of discretion in trademark infringement action

5  where district court granted preliminary injunction to franchisor

6  upon a showing of probable success on the merits where francishor

7  terminated the franchise agreement for material

8  misrepresentations in application, and franchisee continued

9  unauthorized use of the franchisor's trademark).

10                          *Conclusion*

11      The court is keenly aware that "[a] preliminary injunction is

12  a drastic and extraordinary remedy that should not be granted

13  unless the movant, by a clear showing, carries the burden of

14  persuasion." CKE Restaurant v. Jack in the Box, Inc., 494

15  F.Supp. 2d 1139, 1142 (C.D.Cal. 2007) (citing Mazurek v.

16  Armstrong, 520 U.S. 968, 972 (1997)).  As the foregoing

17  discussion shows, because BWI met this burden it was entitled to

18  the preliminary injunction which this court issued on September

19  10, 2007.

20      IT IS ORDERED that the orders entered on September 10, 2007

21  are confirmed.

22      DATED this 5th day of November, 2007.

23

24

25  _____

26                          Robert C. Broomfield
    copies to all counsel of record  Senior United States District Judge

27

28